**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SHAUNNA L. DODD, | Case No.: 2:21-cv-01398-GMN-EJY |
| Petitioner | **Order Denying Petition, Denying Certificate of Appealability and Closing Case** |
| v. | |
| JERRY HOWELL,[1] *et al.*, | |
| Respondents. | |

In Shaunna L. Dodd's 28 U.S.C. § 2254 Habeas Corpus Petition she challenges her murder conviction, arguing state court error at trial and sentencing and ineffective assistance of counsel. (ECF No. 22.)  The Court denies the four remaining claims on the merits, denies a certificate of appealability, and closes the case.

## I.    Background

In October 2013, in Second Judicial District Court (Washoe County), Nevada, a jury convicted Dodd of First-Degree Murder with Use of a Firearm. (ECF No. 35-26.)

---

[1] According to the Nevada Department of Corrections inmate locator page, Dodd is incarcerated at Florence McClure Women's Correctional Center. The department's website reflects William Reubart is the warden for that facility. At the end of this order, the Court directs the Clerk to substitute William Reubart for prior respondent Jerry Howell, under, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

Dodd was found guilty of shooting her husband, Brad Dodd, in December 2012 and staging an invasion of their Washoe Valley home to cover up the murder. (*See* ECF No. 35-1 at 16-41.)  She waived her right to a penalty hearing, and the state district court sentenced Dodd to life in prison without the possibility of parole. (ECF Nos. 35-27, 35-32.)  Judgment of Conviction was entered on December 3, 2013. (ECF No. 35-34.)  The Nevada Supreme Court affirmed Dodd's conviction in December 2014 and the Nevada Court of Appeals affirmed the denial of her state post-conviction habeas petition in June 2021. (ECF Nos. 36-3, 37-22.)

Dodd dispatched her federal habeas petition for mailing about July 26, 2021. (ECF No. 1-1.)  The Court granted her Motion for Appointment of Counsel, and she filed an Amended Petition. (ECF Nos. 10, 22.)  After the Court granted in part Respondents' Motion to Dismiss (ECF Nos. 33, 43), the following grounds remain before the Court:

> Ground 1: The trial court erred by (A) permitting unduly prejudicial evidence of Dodd's sexual history with Ryan Bonnenfant and (B) failing to give appropriate limiting instructions.
>
> Ground 3(A): Trial counsel was ineffective for failing to call a forensic pathologist to testify.
>
> Ground 4: Trial counsel was ineffective for failing to investigate and present evidence of alternative suspects.

(ECF No. 22 at 19-50.)

Respondents have answered the claims, and Dodd replied. (ECF Nos. 52, 53.)

## II.    Trial Testimony[2]

Dodd called 911 in the early hours of December 29, 2012 to report that at least two intruders had entered her home and robbed her at gunpoint of jewelry and drugs. She said they shot her husband Brad in bed, and she feared he was dead.  She had fled to her aunt's house nearby with S., Brad's 16-year-old cousin, who was living with them.

Police were suspicious of Dodd's account of events from the beginning. Washoe County Sheriff's Officer Brandon Zirkle testified that it was snowing when he arrived at the Dodd house. (ECF No. 35-1 at 47-116.)  He saw no footprints around the house, in the driveway, or inside the fence; the front door was unlocked and showed no signs of forced entry.  The victim was dead on the bed in the bedroom and appeared to have been asleep when he was shot.  The way that blood had coagulated led Zirkle to believe that the body had been there longer than the timeframe described by the 911 caller.  The house looked to him as though the robbery had been staged because only a few drawers had been pulled out and only a couple of items knocked off shelves. Marijuana in plain sight had been left untouched.  He noticed the room of the teenage cousin had been ransacked, but she was supposed to have been sleeping there at the time of the home invasion and shooting. Officer Darren Evans testified similarly, noting that it was odd that the blood was already coagulated, the house was not in much

---

[2] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record.  The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court.  Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering Dodd's claims.

disarray for a burglary, the perpetrators supposedly wanted the victim's medical marijuana, but marijuana and drug paraphernalia were out around the house. (*See*, *e.g.*, *id.* at 138-172.) Cash was lying around, and a laptop was untouched. He checked outside and found no footprints going into the house and only the tire tracks of one vehicle.

Officer Lars Eric Christensen met with Dodd at her aunt's house. (*Id.* at 172-194.) Dodd told him that she and her husband were asleep in bed when she heard sounds like someone was in the house. Their two young children were staying with Brad's parents. Dodd was unable to wake up her husband. She went to retrieve her handgun by the front door when someone came up behind her, put an arm around her neck and held a gun to the back of her head. Two people directed her to open the safe in the bedroom closet, and she handed them four gallon-size bags of marijuana and a baseball or softball-sized ball of cocaine. When she tried to look at them, they would shine a flashlight in her eyes. They left her in the closet. She heard her husband say, "What's going on?" then heard two gunshots and the assailants saying something like "go, go, go" or "let's go." (*Id.* at 180.) She heard crashing around the house, and then eventually she heard a vehicle leaving. She saw that her husband was in a pool of blood. She woke up S., and the two fled the house.

Officer David A. Frankel testified that there was no sign of forced entry. (*Id.* at 194-233.) He had been told the thieves were looking for narcotics, but marijuana, prescription drugs, cash and a wallet in open view were left untouched. The house did not look like intruders made much effort to search for drugs; only a few drawers were open and lots of places that would easily hide narcotics were undisturbed. The

kitchen—in his experience a common place to store drugs—appeared untouched.  The victim looked to have been asleep when he was shot; it did not look like he moved or sat up when he asked what was going on.  He was also sleeping in the middle of the bed; it did not appear that Dodd had been asleep in the bed beside him.

Brad's mother Terri Bailor testified that Brad used medical marijuana for back pain. (*Id*. at 244-245.)  He told his mother he never used any other drugs, would never allow other drugs such as methamphetamine or cocaine in the house or around his children, and did not associate with people who used drugs other than marijuana.  Bailor said the Dodds had two pit bull dogs who wouldn't even let her in the house if she tried to come in alone. (ECF No. 35-5 at 25-26, 30-36.)

LaVeta Dudley, owner of the New Washoe Bar where Dodd worked, testified that on the night in question Dodd called her and asked her to hide a garbage bag that Dodd had left in the sagebrush near Dudley's house. (*Id*. at 195-218; ECF No. 35-6 at 5-45.) She asked Dodd what happened and Dodd replied, "I snapped."  (ECF No. 35-5 at 218.) Dudley retrieved the bag and threw it into a snowbank near a mini storage business. When a detective came into the bar, she took him to where she had deposited the bag. When she told Dodd that she had given the bag to the police Dodd said something like, "You screwed me," or "you sentenced me." (ECF No. 35-6 at 17.)  Dodd had a handgun with her at work that Dudley had seen in October or November before the shooting. Dodd had mentioned that she wanted Brad out of her life and that it would be easier if something happened like his car brakes failed.  She also talked about staging a home invasion.  Dudley didn't take it seriously at the time.  Dudley suggested that Dodd talk to an attorney and also offered that she and her kids could come stay with Dudley.  Dodd

also mentioned "taking care of it," and Dudley understood that to mean killing Brad.  On cross-examination, Dudley acknowledged that she only thought at the time that Dodd was blowing off steam.

Dodd's friend Rene Richardson testified that Dodd had said that her life would be much easier if Brad carried out his threat to kill himself. (ECF No. 35-10 at 139-185.) Dodd talked about poisoning Brad or hiring a hit man.  Richardson offered Dodd her student loan money so that Dodd could hire a lawyer and get divorced.  Dodd said she didn't think she could wait that long.  Freddie Columbus testified that in October or November 2012 Dodd asked him if he would "take care of Brad" because he had been a sniper in the military. (ECF No. 35-9 at 20-37.)  Columbus didn't think she was serious. She brought it up later and told him she'd give him whatever he wanted to do it.

S., who had been subpoenaed to testify, said that she went to live with the Dodds when she was 16 so that she could attend school in Carson City. (ECF No. 35-17 at 5-214.)  She was close with Dodd and frequently went with her to the bar when Dodd was working Saturdays and would drink, smoke, and hang out.  S. said that the Dodds' relationship was deteriorating in the fall of 2012.  Dodd was having an affair with Byron Kreck, who at 21 was a decade younger than Dodd.  Dodd expressed fear that if they divorced Brad would take the kids from her.

Dodd mused that there were various ways that Brad could die such as overdosing on his back pills or other drugs, or his car going over a cliff.  She also mentioned hiring someone to kill Brad.  On one occasion Dodd had another teen, Cierra Fisher, give S. crushed pills to put in Brad's drink.[3]  S. put a little bit in Brad's cocktail

---

[3] *See also* ECF No. 35-9 at 37-85, testimony of Cierra Fisher.

then flushed the rest.  He happened to get interrupted and didn't finish that drink.
Another time Dodd directed S. to crush up 15 of Brad's back pills.  They put them in his
drink, but they didn't dissolve.  Brad came into the kitchen, saw Dodd, and asked if she
was trying to spike his drink.  She told him there was something floating in the drink and
dumped it in the  sink.

Around the same time, S. accompanied Dodd and Kreck to see Ed Simon, who
went by the nickname Cowboy, at his tattoo parlor in Reno so that Dodd could talk to
him about killing Brad.  Dodd also talked to Fisher about finding a hit man.  Another
scenario Dodd considered was to make it appear that Brad had ripped off some drug
dealers who then broke in and shot him and stole his drugs.  Dodd told S. that if Brad
was dead that the Dodd children and S. would get social security checks and that they
could sell some possessions and some of the farm animals and move to Colorado
where she had support.

On the night of Brad's death, their children were at their grandparents, and Brad
was watching TV in his room while Dodd and S. played video games in the living room.
As S. and Dodd were going to bed, Dodd said "Let's see if the opportunity will present
itself." (*Id*. at 62.)  S. understood that to mean killing Brad.  S. said Dodd had been
talking about it for months, and she didn't think Dodd would go through with it.  Shortly
after S. got in bed, she heard a loud pop sound.  Dodd came into her room and said, "I
shot him in the neck.  I'm not sure if he's dead.  I'm going to go back and shoot him
again." (*Id*. at 66.)  S. got up and walked toward the front door, plugging her ears and
stomping her feet.  But she still heard the second gunshot.  Dodd came out of the

bedroom and told S. that they needed to make the house look like a break-in, as if people broke in, shot Brad, and stole his drugs.  S. was scared, nauseous, and anxious. She complied and knocked items off shelves, pulled drawers out and threw chairs around.  When she went to go get her purse and phone, she "destroyed" her room. (*Id*. at 68.)  Dodd had changed out of the clothes she had been wearing and gave S. a white garbage bag to take to the car.  Dodd headed to Dudley's house; she said that she and S. needed to come up with a story to tell police.  Dodd said two people broke into the house and shot Brad and stole his drugs and jewelry.  Dodd walked inside the gate at Dudley's and buried the bag in the snow.  Then they drove a couple of blocks to Dodd's aunt Heather Mundy's house.  Dodd woke Mundy up,  and they called 911.  Dodd told dispatch that people broke in and shot her husband.  At some point Dodd observed that she had forgotten to change the Goonies t-shirt she was wearing so she took it off.  S. was in the bathroom throwing up when police arrived.  She gave them a verbal and written statement, telling them what Dodd told her to say.  She loved Dodd then and still loved her at trial.  Later Dodd got a phone call; she told S. that the white garbage bag had been found.  She appeared really scared and said that "shit's gonna hit the fan." (*Id*. at 97.)

S. was taken to a foster care facility; sick with stress, she couldn't eat or keep anything down, her body ached, and she lost a lot of weight.  She decided that she wanted to tell the truth, told a staff member, and they had her social worker come take a statement.  The next day the social worker took her to the police station and she told Detective James Cox what had really happened.

On cross-examination, S. stated that she had witnessed some heated discussions between Dodd and Brad.  She didn't like the way Brad treated Dodd and sometimes tried to come to her defense.  She testified that she was briefly in one behavioral health facility, then spent about six months in a secured psychiatric hospital. She has been diagnosed with dissociative disorder and has difficulty remembering things. (*See also* ECF No. 35-5 at 79-194, testimony of homicide detective James Cox.)

DNA from small bloodstains on the sweatshirt that was in the garbage bag Dodd discarded matched Brad's. (ECF No. 35-6 at 93-147.)  DNA from a blood stain on the exterior of a latex glove in the bag matched Brad's, and DNA from the inside of the glove matched Dodd's.  A firearms analyst determined that the two bullets removed from the victim's head were fired from the gun that belonged to Dodd. (ECF No. 35-6 at 185-210.)

Byron Kreck testified that he and Dodd had a casual relationship in the fall of 2012 and had had sex several times at the Dodd house. (ECF No. 35-17 at 215-307.) He said that he and Dodd, with S., went to see Cowboy; Dodd and Kreck had a private conversation with Cowboy about him beating up Brad and telling him that he needed to let Dodd leave and file for divorce.  Kreck said that he could understand if Cowboy was under the impression that he was being asked to kill Brad.[4]  Around October Dodd began carrying a handgun that Brad had gotten for her.  Kreck went target shooting with Dodd and they each loaded and fired the gun.

The relationship ended around the beginning of December.  Kreck had started seeing another woman and they began dating more seriously at the end of December.

---

[4] *See also* ECF No. 35-10 at 26-45, 59-97, testimony of "Cowboy" Ed Simon.

He had dinner with her family on Christmas Day.  The next day he, his new girlfriend, and her toddler left for Lovelock, Nevada to help his grandfather move.  Kreck said that he had returned from Lovelock to Carson City on December 27 to pick up and cash a check.  He then picked up a U-Haul in Lovelock that night. He wasn't sure but he thought that he remained in Lovelock until December 30.  The morning of the shooting, December 29, Dodd called him; she told him there was an emergency and she needed LaVeta Dudley's number.  Police later spoke with him, his girlfriend and his grandfather and he gave police a DNA sample.  He wasn't completely truthful the first time he talked with detectives about Brad's murder because he wanted to stay out of it.  He didn't tell detectives about the target shooting until they told him his DNA was on the clip of the gun.

### III.  Discussion

#### a.  AEDPA Legal Standard and Analysis

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), provides the legal standards for this Court's consideration of the Petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538

1 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause

2 requires the state court decision to be more than incorrect or erroneous; the state

3 court's application of clearly established law must be objectively unreasonable. *Id*.

4 (quoting *Williams*, 529 U.S. at 409).

5     To the extent that the state court's factual findings are challenged, the

6 "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas

7 review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause

8 requires that the federal courts "must be particularly deferential" to state court factual

9 determinations. *Id*. The governing standard is not satisfied by a showing merely that the

10 state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires

11 substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

15     *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393

16 F.3d at 972.

17     Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be

18 correct unless rebutted by clear and convincing evidence. The petitioner bears the

19 burden of proving by a preponderance of the evidence that he is entitled to habeas

20 relief. *Cullen*, 563 U.S. at 181.

21 **Grounds 1(A) & (B)**

22     Dodd alleges that the trial court erred in admitting bad act evidence and failing to

23 give a limiting instruction. (ECF No. 22 at 20-31.)

1    Questions about the admissibility of evidence are matters of state law. *Bashor v.*

2  *Risley*, 730 F.2d 1128, 1239 (9th Cir. 1983).  Errors of state of law generally do not

3  warrant federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  "The

4  admission of evidence does not provide a basis for habeas relief unless it rendered the

5  trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926,

6  930 (9th Cir. 1995) citing *Estelle*, 502 U.S. at 67-68.  However, evidence that is so

7  unduly prejudicial that it renders the trial fundamentally unfair violates federal due

8  process. *Andrew v. White*, 604 U.S. 86 (2025), citing *Payne v. Tennessee*, 501 U.S.

9  808, 825 (1991).

10    A petitioner is entitled to federal habeas relief only where a trial court's admission of

11  certain evidence "so fatally infected the proceedings as to render them fundamentally

12  unfair" in violation of the petitioner's due process rights. *Jammal v. Van de Kamp*, 926

13  F.2d 918, 919 (9th Cir. 1991); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101

14  (2009).  The "category of infractions that violate 'fundamental fairness'" has been

15  interpreted very narrowly. *Dowling v. United States*, 493 U.S. 342, 352 (1990).

16    NRS 48.045(2) prohibits the use of evidence of "other crimes, wrongs or acts ... to

17  prove the character of a person in order to show that the person acted in conformity

18  therewith."  But such evidence may be admissible for other purposes identified in the

19  statute, as well as for nonpropensity purposes not listed in the statute. *Bigpond v. State*,

20  270 P.3d 1244, 1245 (2012).  But the use of uncharged bad act evidence to convict a

21  defendant remains heavily disfavored "because bad acts are often irrelevant and

22  prejudicial and force the accused to defend against vague and unsubstantiated charges.

23

Thus, [a] presumption of inadmissibility attaches to all prior bad act evidence." *Newman v. State*, 298, P.3d 1171, 1178 (Nev. 2013), (citations omitted).

The "principal concern with admitting such evidence is that the jury will be unduly influenced by the evidence, and thus convict the accused because the jury believes the accused is a bad person." *Walker v. State*, 997 P.2d 803, 806 (Nev. 2000); *Michelson v. United States*, 335 U.S. 469, 476 (1948) (noting that such evidence "is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad record and deny him a fair opportunity to defend against a particular charge").

To overcome the presumption of inadmissibility the prosecutor must establish that: "(1) the prior bad act is relevant to the crime charged and for a purpose other than proving the defendant's propensity, (2) the act is proven by clear and convincing evidence, and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Bigpond*, 270 P.3d at 1250 (modifying the first prong of the test first announced in *Tinch v. State*, 946 P.2d 1061, 1064-65 (Nev. 1997) ("(1) the incident is relevant to the crime charged").

In ground 1(A) Dodd contends that the trial court erred by admitting unduly prejudicial evidence of Dodd's one-night encounter with Ryan Bonnenfant. (ECF No. 22 at 20-23.) The court conducted a *Petrocelli* hearing and concluded that Bonnenfant's testimony was more probative than prejudicial with respect to motive and that clear and convincing evidence supported his testimony. (ECF No. 35-10 at 109-120.)

Bonnenfant testified that he knew Dodd but hadn't seen her for ten years when he encountered her working at the New Washoe bar in October 2012. (ECF No. 35-10 at 109-139.) In the middle of December he went with Dodd to her house to hang out.

About a week before Christmas he went to the bar and Dodd was working again.  Later

that night, he and Rene Richardson accompanied Dodd to her house.  After Richardson

left, Bonnenfant sat and talked with Dodd; on this occasion they had sex.  Bonnenfant

left afterward, and he hasn't seen Dodd since.

Prosecutors argued in closing that the sexual encounter with Bonnenfant further

illustrated that Dodd was unhappy in her marriage:

> So this is the second individual that's testified under oath about the
> affair she's having – the affairs they're having with the defendant.
>
> What this shows is, this isn't about affairs, but it shows that the
> marriage was over, and she wanted out. She was bringing men to the
> house to have sexual relations in the bed where her husband sleeps and
> ended up getting murdered. It was over. She wanted out. She was done,
> as she said, numerous times.

(ECF No. 35-24 at 36.)

The Nevada Supreme Court concluded that the court did not abuse its discretion in

admitting evidence of the encounter with Bonnenfant:

> Dodd argues further that the district court abused its discretion in
> admitting testimony about an extramarital sexual encounter between Dodd
> and Ryan Bonnenfant because this evidence of infidelity would unfairly
> prejudice the jury against Dodd. Under NRS 48.045(2), prior bad act
> evidence is not admissible to prove the character of a person, but may be
> admissible to show "proof of motive, opportunity, intent, preparation, plan,
> knowledge, identity, or absence of mistake or accident." Here, the district
> court conducted a hearing outside the jury's presence as required by
> *Petrocelli v. State*, 101 Nev. 46, 51, 692 P.2d 503, 507 (1985), modified
> on other grounds by *Sonner v. State*, 112 Nev. 1328, 1333-34, 930 P.2d
> 707, 711-12 (1996) and superseded in part by statute as stated in *Thomas
> v. State*, 120 Nev. 37, 45, 83 P.3d 818, 823 (2004), and determined that
> the evidence was relevant to Dodd's motive to kill her husband, that the
> prior bad act was proven by clear and convincing evidence, and that the
> evidence was more probative than unfairly prejudicial. *See Bigpond v.
> State*, 128 Nev. , , 270 P.3d 1244, 1250 (2012) (discussing three findings
> required to overcome presumption under NRS 48.045(2) that prior bad act
> evidence is inadmissible). The record supports each of the district court's
> determinations. Accordingly, we conclude that the district court did not

15

abuse its discretion in admitting evidence of Dodd's infidelity with Bonnenfant. *See Braunstein v. State*, 118 Nev. 68, 72, 40 P.3d 413, 416 (2002) (stating that decision whether to admit prior bad act evidence is discretionary and will not be reversed absent a manifest abuse of discretion).

(ECF No. 36-3 at 3.)

Dodd cannot demonstrate that the Nevada Supreme Court's decision on federal ground 1(A) was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  This evidence of another extramarital encounter was relevant to motive. Bonnenfant testified with specificity regarding the sole instance when he had sex with Dodd, which occurred just before Brad was killed. *See Walker*, 997 P.2d at 806-807 (bad acts remote in time have less relevance in proving later intent).  This was not vague and unsubstantiated bad-act evidence. *Newman*, 298 P.3d at 1178.  The prosecutor observed in closing arguments that the point of presenting evidence of affairs to the jury was to show that Dodd wanted out of the marriage. The state appellate court reasonably concluded that the evidence was probative and not unduly prejudicial.  Dodd has not shown that the trial court's admission of the evidence violated her due process rights and rendered the trial fundamentally unfair. *Jammal*, 926 F.2d at 919.  Habeas relief on ground 1(A) is, therefore, denied.

In ground 1(B) Dodd argues that the trial court erred by failing to issue appropriate limiting instructions immediately before each witness who testified to prior bad acts in violation of her right to a fair trial. (ECF No. 22 at 23-31.)  The Nevada Supreme Court has held that the trial court should specifically instruct the jury on the purposes for which

1  bad-act evidence is admitted immediately before it is admitted and should also give a

2  general instruction at the end of trial reminding the jury that bad-act evidence may only

3  be used for limited purposes. *Tavares v. State*, 30 P.3d 1128, 1133 (Nev. 2001).

4      The trial court instructed the jury:

5          Sometime, ladies and gentlemen, beginning today, or through this
           week, you will hear evidence regarding alleged prior bad acts. This
6          evidence is being presented for a limited purpose. The evidence may or
           may not show motive, opportunity, intent, preparation, plan, knowledge, or
7          identity. You may accept or reject the evidence, as you may any evidence
           presented at this trial.

8
           However, if you accept the evidence regarding prior bad acts as
9          proven, it cannot be used by you except as it relates to motive,
           opportunity, intent, preparation, plan, knowledge, or identity.

10
           You're not to consider any prior bad-acts testimony as evidence of guilt
11         of the crime for which the defendant is now on trial.

12         You're being given this instruction now, because it is important that you
           understand this evidence is to be treated differently than the other
13         evidence in the trial.

14         The use of this evidence is legally restricted. You may use the
           evidence for no other purposes.

15
           I have just read from the written instruction. And you will have a copy
16         of this instruction when you enter the jury room for deliberations. This
           instruction may be the subject of some argument by counsel at the closing
17         of the case.

18  (ECF No. 35-9 at 12-13.)

19      Immediately after this instruction, Washoe County Sheriff's Detective Joshua Palmer

20  testified. (*Id.* at 13.) Palmer described items recovered from Dodd's aunt's house; he

21  was not a bad-act witness. (*See e.g.*, *id.* at 16.) After Palmer, the next several

22  witnesses' testimony included references to Dodd's affair with Kreck, and Bonnenfant

23

testified about having sex with Dodd days before Brad was killed.  The district court did not issue a limiting instruction immediately before the witnesses testified.

The jury instructions at the conclusion of the State's and defense's cases included No. 24:

> Evidence of other crimes, wrongs or acts is admissible to prove motive, intent, preparation, the existence of a common scheme or plan, or identity. However, such evidence is not admissible simply to prove the character of a person in order to show he or she acted in conformity therewith and is not to be considered by you for that purpose.

ECF No. 52-1

The Nevada Supreme Court agreed that the district court erred and considered any prejudicial effect:

> Dodd argues that the district court erred in failing to provide a limiting instruction before the testimony of each witness who testified to prior bad acts. "[T]he trial court should give the jury a specific instruction explaining the purposes for which [prior bad act] evidence is admitted immediately prior to its admission and should give a general instruction at the end of trial." *Tavares v. State*, 117 Nev. 725, 733, 30 P.3d 1128, 1133 (2001). Here, the district court gave a limiting instruction before any prior bad act testimony was presented. However, the first witness who testified after that instruction did not address any prior bad acts; the next seven witnesses testified to prior bad acts but there was no limiting instruction immediately before their testimony. The district court provided another limiting instruction before the jury deliberated. Although Dodd did not object to the manner in which the district court instructed the jury, it does not appear that she "explicitly waive[d] the limiting instruction prior to the admission of the evidence" so as to relieve the district court of its duty to properly instruct the jury. *Mclellan v. State*, 124 Nev. 263, 270, 182 P.3d 106, 111 (2008). We agree with Dodd that the district court erred in failing to give a limiting instruction immediately before the testimony relating to Dodd's prior bad acts. We are not persuaded, however, that this error had any injurious effect or influence on the jury's verdict in light of the instructions provided and the overwhelming direct evidence supporting Dodd's conviction. *See id*. at 269, 182 P.3d at 110 ("The failure of the district court to issue a limiting instruction will be reviewed for nonconstitutional error under NRS 178.598."). In particular, by providing a limiting instruction before the jury heard any testimony regarding prior bad acts, the district court guided the jury to avoid considering the evidence for

an improper purpose. *Tavares*, 117 Nev. at 733, 30 P.3d at 1133; *see Rhymes v. State*, 121 Nev. 17, 24, 107 P.3d 1278, 1282 (2005) (finding error harmless where the district court erred by failing to give a bad-act limiting instruction at the time the testimony was admitted but gave a limiting instruction prior to the jury being charged); *Leonard v. State*, 117 Nev. 53, 66, 17 P.3d 397, 405 (2001) (providing that the jury shall be presumed to have followed its instructions). We conclude that no relief is warranted on this claim.

(ECF No. 36-3 at 2-4.)

The trial court should have instructed the jury immediately before the testimony. However, the court did instruct the jury as to the permissible consideration of other-bad-act evidence.  The Court also notes that detective Palmer's testimony—less than six pages of the trial transcript, with direct examination only—was brief and the witnesses who testified to bad acts followed immediately. (*See* ECF No. 35-9 at 13-19.)  The jury instructions also again explained such evidence was to be considered for certain purposes only.  And overwhelming direct evidence, including testimony by police regarding the investigation and forensic evidence and testimony by S., supported Dodd's conviction.  Dodd also has not invoked any clearly established federal law on the improper timing of a limiting instruction.  Dodd has not shown that the Nevada Supreme Court's decision on federal ground 1(B) was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  Accordingly, the Court denies habeas relief on ground 1(B).

### b.  Ineffective Assistance of Counsel

Ineffective assistance of counsel ("IAC") claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687).  To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*.  To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*.  A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*.  Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted).  When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that

there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105.  "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689).  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id*. (internal quotations and citations omitted).

**Ground 3(A)**

Dodd contends that her trial counsel was ineffective for failing to call a forensic pathologist at trial to oppose the State's expert. (ECF No. 22 at 41-45.)  She explains that the State's expert testified at the preliminary hearing that he could not determine which of the two shots was fired first, but at trial he testified that the shot to the neck occurred before the shot to the head.  Defense counsel had earlier consulted with an expert who had agreed with the state expert's first opinion that it wasn't possible to ascertain which shot was fired first.  Dodd argues that her counsel should have called the expert to testify at trial to challenge the state expert's opinion.  The United States Supreme Court has observed that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence…." *Harrington*, 562 U.S. at 106.

Medical examiner Piotr Kubiczek testified at trial that at the time of the preliminary hearing he could not determine, based on his examination alone, which of the two gunshots came first. (ECF No. 35-18 at 34-73.)  Once he viewed additional evidence, including photographs of the crime scene, he determined that Brad had been shot in the neck first.  He explained that a much smaller amount of blood was present from the shot

to the head than the shot to the neck.  Based on his examination of the body, review of

the death scene photographs, and consultations with other pathologists, he concluded

that Brad was first shot in the neck.  He stated that the shot to the neck was not lethal

and the heart continued to pump blood, which is why there was so much more blood

from the neck wound.  Brad would have been paralyzed but remained alive for a few

minutes until he was shot in the back of the head.

Defense counsel Mazie Pusich testified at the state post-conviction evidentiary

hearing that forensic pathologist Terri Haddix assisted with defense preparation for trial.

(ECF No. 36-55 at 8-42, 49-53, 82.)  Counsel said that Haddix had agreed with

Kubiczek's preliminary hearing testimony that it was not possible to discern which shot

had been fired first.  The State's expert then testified at trial that Brad was shot first in

the neck and then shot in the back of the head.  The defense had not subpoenaed

Haddix for trial because they did not anticipate that the prosecution expert would

change his testimony.  Counsel did not object at trial, but she did question the expert

and highlight the inconsistency.  Counsel said that she did not have a specific reason

that she did not move for a mistrial.

The Nevada Court of Appeals held that Dodd failed to demonstrate a reasonable

probability of a different outcome:

> …Dodd claimed counsel was ineffective for failing to call a pathologist
> at trial to challenge the State's expert's testimony in which he changed his
> opinion regarding the sequence of the victim's gunshot wounds.  Dodd did
> not present any evidence at the evidentiary hearing as to what such an
> expert's testimony would have been.  Therefore, Dodd failed to demonstrate
> a reasonable probability of a different outcome but for counsel's failure to
> call a pathologist at trial.  We therefore conclude the district court did not err
> by denying this claim.

(ECF No. 37-22 at 3.)

The state appellate court pointed out that Dodd did not explain what testimony a defense expert would have provided at trial.  The medical examiner credibly explained why his trial testimony differed from his testimony at the preliminary hearing.  He explained that, after the preliminary hearing, when he had evidence from the crime scene in addition to his own examination of the body, he was then able to determine that Brad was first shot in the neck.  Dodd has shown no probability of a different outcome had the defense presented expert testimony from a pathologist.  She has not demonstrated that the Nevada Court of Appeals' decision on federal ground 3(A) was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  The Court denies habeas relief on ground 3(A).

**Ground 4**

Dodd asserts that her trial counsel was ineffective for failing to investigate and present evidence that Byron Kreck was a potential alternative suspect. (ECF No. 22 at 47-50.)  She asserts that Kreck had a criminal history and had had an altercation with her husband a few months before his death.  She argues that counsel failed to investigate his alibi.

Defense counsel testified at the state post-conviction evidentiary hearing that Kreck was the primary alternate suspect that the defense considered and that he had motive and opportunity. (ECF No. 36-55 at 16, 21-30, 67, 103.)  Kreck was in his early twenties at the time of trial, but already "had a bit of a rap sheet." (*Id*. at 22.)  Defense counsel thought that Kreck may have had one or two motives for killing Brad, including his

relationship with Dodd and a prior incident with Brad.[5]  She recalled Kreck's alibi was

that he had been in Lovelock and that that story changed a bit.  Kimberly Dandos, an

owner of a Carson City bar said that Kreck had been at her bar for a least part of the

evening of Brad's death.  Defense counsel acknowledged that it "could have" been

helpful to have the woman testify to cast doubt on Kreck's alibi. (*Id*. at 30.)  But she said

that the bar owner's testimony also could have supported the theory that Kreck was at

the bar when Brad was killed. (*Id*. at 67.)  Defense counsel said that the defense had

interviewed Dandos, and her testimony would have been that Kreck was at the bar the

day Brad was killed, and a few minutes after he left a group of men, including Brad's

brother, came looking for Kreck.  Defense counsel had elicited testimony at trial from

Kreck's stepfather that Kreck had threatened to murder him, that from the moment he

heard about Brad's death he thought Kreck was involved, and that he viewed Kreck as

a "cold-hearted son of a bitch." (*Id*. at 103.)

Kimberly Dandos also testified at the evidentiary hearing. (*Id*. at 163-173.)  In

December 2012, she owned a bar in Carson City and had known Kreck about a year

through a pool league.  She said Kreck came into the bar around 4 or 4:30 p.m. on

December 29.  He was there for a few hours; Dandos did not see him leave.  Four

extremely agitated men including Brad's brother came in looking for Kreck.

The Nevada Court of Appeals concluded that Dodd did not demonstrate deficiency

or prejudice:

---

[5] One night Brad showed up at the bar, angry that Dodd was still working there when he wanted
her to quit. As he sped out of the parking lot he ran over another patron's foot. (*See* ECF No.
35-10 at 149-156, 160-164.) Kreck put his arm inside the car window and was hanging on,
trying to get Brad to remain on the scene. (*See* ECF No. 35-17 at 266-268.)

…Dodd claimed counsel was ineffective for failing to adequately investigate Byron Kreck as an alternative suspect. Dodd claimed that counsel should have further investigated inconsistencies in Kreck's alibi and should have called Kimberly Dandos to testify regarding Kreck's proximity to the murder scene near the time of the murder. Kreck was called by the State to testify at trial and was cross-examined regarding inconsistencies in his alibi. At the evidentiary hearing, Dandos testified that Kreck came into her bar more than eight hours after officers arrived at the murder scene. Dodd failed to demonstrate what additional investigation would have uncovered to further the defense theory establishing Kreck as an alternative suspect. Therefore, Dodd failed to demonstrate counsel was deficient and a reasonable probability of a different outcome but for counsel's failure to further investigate Kreck as an alternative suspect. We therefore conclude the district court did not err by denying this claim.

(ECF No. 37-22 at 3.)

Dodd has not demonstrated that counsel was deficient for failing to adequately investigate Kreck. Counsel elicited testimony from Kreck highlighting inconsistencies in his alibi and in what he told police after the murder, including whether he was in a relationship with Dodd and whether he had ever fired the murder weapon. Kreck's stepfather testified that he immediately assumed that Kreck was involved in Brad's death. Dandos' proffered testimony would not have contradicted Kreck's testimony. The State presented overwhelming evidence of Dodd's guilt. Dodd has not shown that the Nevada Court of Appeals' decision on federal ground 4 was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The Court denies habeas relief on ground 4.

The Petition, therefore, is denied in its entirety.

## IV.    Certificate of Appealability

This is a final order adverse to the Petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

Having reviewed its determinations and rulings in adjudicating Dodd's petition, the court finds that none of those rulings meets the *Slack* standard.  The Court therefore declines to issue a Certificate of Appealability for its resolution of Dodd's Petition.

### V.    Conclusion

It is therefore Ordered that the Petition (ECF No. 22) is **DENIED**.

It is further Ordered that a Certificate of Appealability will not issue.

The Clerk of the Court is directed to:

- Substitute William Reubart for Respondent Jerry Howell; and

- Enter judgment accordingly and close this case.


DATED: 18 December 2025.

_____

GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE